UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SCOTT SCHERMITZLER,

          Plaintiff,

     v.                          Case No. 20-C-236

ALLISON SWANSON and
VILLAGE OF ASHWAUBENON,

          Defendants.

## DECISION AND ORDER

Plaintiff Scott Schermitzler filed this action against his former employer, the Village of Ashwaubenon, and Allison Swanson (now Buckley), the former Village Manager, alleging claims under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*, 42 U.S.C. § 1983, Wisconsin Wage Payment and Collections statutes (WWPC), Wis. Stat. § 109.01, *et seq.*, as well as a state common law claim of defamation and slander. The Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and his state law claims under 28 U.S.C. § 1367. The case is before the Court on Plaintiff's motion for partial summary judgment on his FMLA interference and ADA claims and Defendants' motion for summary judgment on all claims. For the reasons that follow, both motions will be partially granted.

## BACKGROUND

Plaintiff was employed by the Village of Ashwaubenon as a Public Safety Officer (PSO) for more than 26 years, until he was terminated on April 25, 2019. Plaintiff's Proposed Material Facts (PPMF) ¶ 3, Dkt. No. 22. Unlike most municipalities, the Village of Ashwaubenon has

combined its police and firefighter agencies into a single Public Safety Department with PSOs performing both functions. Most PSOs work a "firefighter-type" work schedule, consisting of a 24-hour shift on and two 24-hour shifts off, rotating throughout the year. For the first eight hours of the shift, the PSOs perform traditional police functions. They spend the remaining 16 hours waiting for fire or paramedic/EMT calls for service. As a PSO, Schermitzler was required to act, at various times, as a paramedic, firefighter, and police officer and was often the first to respond to accidents, emergencies, and other incidents. *Id.* ¶¶ 4–5; *see also* Job Description, Dkt. 46-8 at 68. At all times relevant to the event out of which the case arises, Swanson served as Village Manager.

Schermitzler claims that due to the extreme demands of his work experienced over many years, he began to suffer mentally, emotionally, and physically in 2018. He experienced a host of symptoms including sleeplessness, irritability, anxiety, hopelessness, depression, and others. In the early fall of 2018, Schermitzler spoke with Swanson about the possibility of taking early retirement. Swanson told Schermitzler that he was not eligible for early retirement under the Wisconsin Retirement System because he was not yet 50 years old. Defendants' Proposed Findings of Fact (DPFOF) ¶ 15. On Friday, September 28, 2018, Schermitzler spoke to his primary care physician, Dr. R. L. Meves, regarding his condition. Dr. Meves expressed grave concern and recommended that Schermitzler take an immediate leave of absence from his job and promptly undergo treatment. PPMF ¶¶ 6–7.

Notwithstanding Dr. Meves' recommendation, Schermitzler worked his scheduled 24-hour shift from Sunday, September 30, 2018, at 7:00 a.m. until Monday, October 1, 2018, at 7:00 a.m. That was the last shift he worked for the Village. After completing his shift on October 1, 2018, Schermitzler spoke with Chief Eric Dunning, who recommended that he follow his doctor's advice

and take a leave of absence. Schermitzler then spoke with Terri Lewis, a confidential executive secretary who was assigned to administer the FMLA process for the Village and told her he wanted to take FMLA leave. Lewis gave Schermitzler an application for FMLA leave, a medical certification form, and the FMLA Notice of Rights letter. Schermitzler promptly delivered the medical certification to Dr. Meves' office. *Id.* ¶¶ 9–12.

Schermitzler delivered his completed application to Lewis on Wednesday, October 3, 2018. *Id.* ¶ 13. He requested 12 weeks of medical leave beginning October 3, 2018, during which he would be completely absent from work. Dkt. No. 40-7 at 2. In the space provided for any general comments pertaining to the request, Schermitzler wrote:

> After 26 years of dealing with other peoples [sic] tragedies and being on the edge of chaos my body is worn. I can no longer allow the shift work and adrenaline dumps to affect my health. (Hypertension/hyperlipidemia/metabolic syndrome/diabetes/ skin cancer.[)] I need time off to see if improvements can happen.

*Id.* at 3.

Schermitzler picked up the completed medical certification form from Dr. Meves' office on Monday, October 8, 2018, and delivered that document to Lewis the same day. PPMF at ¶¶ 12– 14. Dr. Meves noted on the medical certification form that Schermitzler had a condition that commenced on March 1, 2018, or in the last six months. As for the duration of the condition, Dr. Meves wrote "indefinite—depends how he responds to treatment." Dkt. No. 40-7 at 4. Checked boxes on the pre-printed certification form indicated that Schermitzler was unable to perform any of his job functions, had not been hospitalized or prescribed medication, would need to have treatment visits at least twice per year due to the condition, and would be incapacitated for a single continuous period of time due to his medical condition, including any time for treatment and recovery. *Id.* In the space where he was to identify the job functions he could not perform, Dr. Meves wrote "work/change needs to occur for him to continue working." *Id.* Dr. Meves indicated

that he had referred Schermitzler to the EAP (employee assistance program) counselor for evaluation or treatment. In a space where he was to describe other medical facts related to the condition for which leave was sought, Dr. Meves wrote: "Not sleeping, sour mood at home, can't leave work at work, takes home with him." *Id.* With respect to the care needed and why it was needed, Dr. Meves wrote, "Rest, diversion from work stress." *Id.* at 5. In the space for his estimate of the beginning and ending dates of the disability, Dr. Meves wrote, "9/29/2018 to 12/29/2018 for now." *Id.*

Notwithstanding the fact that Lewis normally handled FMLA applications by Village employees, Swanson took charge of Schermitzler's application. Dkt. No. 40-15 at 10–12. Later that same day, Swanson sent Schermitzler an email to which she attached a letter. In her letter, Swanson acknowledged receipt of Schermitzler's FMLA paperwork but stated she needed additional information from Dr. Meves and would be contacting him directly to obtain it. Swanson further stated in her letter to Schermitzler, "At this time your request is not approved until it is determined whether you qualify for FMLA leave." PPMF ¶ 17; *see also* Dkt. No. 40-7 at 8.

On October 11, 2018, Swanson sent a letter to Dr. Meves requesting additional information concerning Schermitzler's request for FMLA leave. The letter listed nine questions that Swanson asked Dr. Meves to answer concerning Schermitzler's diagnosis and the information contained in the certification Dr. Meves had completed. Dkt. 40-7 at 9. Dr. Meves wrote his responses to Swanson's questions next to each question and also completed a Return to Work Recommendations form Swanson had asked him to complete. In his response to Swanson's questions, Dr. Meves identified Schermitzler's serious medical condition as "stress reaction, anxiety, and depression." *Id.* In response to a request for information on "the relevant medical facts about Mr. Schermitzler's serious medical/health condition that result in his inability to work

4

at this time," Dr. Meves wrote, "That's in his medical record." *Id.* When asked to elaborate on his prior statement that "work/change needs to occur for him to continue working," Dr. Meves wrote, "It's not up to me to correct your workplace malfunction. Talk to your employees—get their input." *Id.* He largely left the "Attending Physician's Return to Work Recommendations Record" form blank, noting only that the return to work date changed to January 2, 2019, and that "[h]e may contact me earlier than 12/31/18, if situation worsens or improves." *Id.* at 10.

Schermitzler picked up both Dr. Meves' response and the Return to Work form from Dr. Meves' office on Friday, October 19, 2018, and delivered both documents to Lewis. That same day, Swanson reviewed the additional information and informed Schermitzler that the additional information was still insufficient. She followed up her conversation with Schermitzler with an email stating: "[W]e will wait until Monday to see if you have additional information to be considered for your FMLA request. But barring a change in information provided your FMLA request will be denied[;] your request is not eligible under FMLA." *Id.* at 12.

On Monday, October 22, 2018, Dr. Meves called Swanson. DPFOF ¶ 28. According to Swanson, the "phone call was heated and Dr. Meves was combative." *Id.* During the discussion, Dr. Meves told Swanson that Schermitzler could "pick and choose" what he could do. Swanson Dep., 63:21–64:1, Dkt. No. 40-6. In response to Dr. Meves' "going on" about Schermitzler's "illustrious career," Swanson mentioned that Schermitzler was under investigation and had been previously disciplined for an OWI, and they should not just agree to whatever he said. *Id.* at 64:4–24. On the same day, the Village also received a letter from Carrie Schatzman, a licensed professional counselor, notifying it that Schermitzler had begun counseling with her on October 9, 2018, and had attended two sessions to date. DPFOF ¶ 29; *see also* Dkt. No. 40-7 at 14. The Village denied Schermitzler's FMLA request on October 24, 2018. PPMF ¶ 29. The memo

denying Schermitzler's request simply said "FMLA does not apply to your request."  Dkt. No. 40-7 at 16.

Over the following weeks, Schermitzler continued to engage with the Village.  He wrote and delivered a letter on October 25, 2018, requesting an explanation as to why Dr. Meves' opinions were not sufficient, and delivered another letter to the Village on October 26, 2018, from Dr. Meves, which included additional information about his medical diagnosis and treatment. PPMF ¶¶ 30–31.  Dr. Meves stated that Schermitzler had been diagnosed with post-traumatic stress disorder (PTSD), and had experienced some improvements in feelings of well-being, ability to sleep, and mood since beginning treatment.  Dkt. No. 40-7 at 17.  Dr. Meves also noted that Schermitzler had agreed to a trial of an anti-depressant and was awaiting referrals to psychiatry and counseling.  *Id.*  Schermitzler sent Swanson an email on October 31, 2018, letting her know that he had set up weekly visits with a therapist and notifying her that he would continue to request sick leave.  Dkt. No. 24-5 at 19.

At the time Schermitzler first applied for FMLA leave in early October of 2018, he had accrued more than 2,000 hours of sick pay benefits with the Village.  Swanson construes the Village's Employee Handbook to read that employees are generally allowed to take only three consecutive days of sick leave unless they apply for and are granted FMLA leave.  DPFOF ¶¶ 12, 13.  Because Schermitzler's request for FMLA leave was denied, Swanson advised him that he was not eligible for sick leave.  As a result, Schermitzler was required to use his vacation and comp time benefits to support himself and his family while he was off work after his third missed shift which occurred on October 9, 2018.  PPMF ¶¶ 33–36, 39.  At the same time, Swanson advised Schermitzler that the Village would consider a new FMLA request if he submitted additional

FMLA paperwork, "assuming it is with a new doctor and with new information," and asked him to notify them of how they could facilitate his return to work. Dkt. No. 24-5 at 20.

Swanson and Schermitzler continued to exchange emails regarding his leave and his FMLA request. On November 9, 2018, Swanson sent Schermitzler an email explaining in greater detail why she denied his request for FMLA leave:

> We have discussed previously that the information submitted to the Village does not constitute a serious medical condition under FMLA. When we requested additional information from your doctor, there was no indication of specific duties, responsibilities, or physical abilities that you were unable to complete as he stated that was "to be determined" and he hadn't really assessed your job description and declined to do so. In a follow up phone call I had with Dr. Meves, he stated that you could "pick and choose" when you wanted to work. The records show he is also not actually treating you for stress, anxiety or depression in that he was not scheduled to see you again until December 31, 2018, he referred you to the Village's employee assistance program, and he felt no medications were necessary. There are no records provided to us establishing a serious medical condition under FLMA. Since there is no serious medical condition, it does not qualify for FMLA.

*Id.* at 23.

Eventually, on November 27, 2018, Schermitzler submitted another FMLA request listing November 15, 2018, as the date his qualifying condition commenced and accompanied by a health care provider certification form completed by Nurse Practitioner Erika Mangin. *Id.* at 26. On December 3, 2018, the Village retroactively approved Schermitzler's request for FMLA leave beginning November 15, 2018. *Id.* at 31–32.

In late 2018 or early 2019, Schermitzler filed a complaint with the U.S. Department of Labor (DOL) seeking unpaid sick leave benefits from the Village. DPFOF ¶ 41. In early 2019, the DOL brokered a settlement agreement covering the period from November 3, 2018, through the week ending November 17, 2018. That agreement was signed by the Village on February 28, 2019, and by Schermitzler on March 7, 2019. Under the terms of that agreement, the Village agreed to pay Schermitzler an amount equal to the sick pay benefits that he would have received

from November 3 to November 17, 2018, had his FMLA request been approved. PPMF ¶ 38. Also, as part of the agreement, Schermitzler was prohibited from bringing suit for those wages or benefits. Dkt. No. 24-5 at 31.

On December 26, 2018, Schermitzler submitted another FMLA request form, which was preceded by another provider certification form completed by Nurse Practitioner Mangin, asserting that his serious health condition commenced on October 3, 2018. DPFOF ¶¶ 39–40. Swanson responded that she would be seeking a second opinion from another provider and engaged Dr. Craig Childs to conduct an evaluation. *Id.* ¶¶ 40, 42. Dr. Childs opined that Schermitzler was unfit for duty as a public safety officer, and the Village approved his leave through March 24, 2019. *Id.* ¶ 45.

On March 14, 2019, the parties met to discuss Schermitzler's options after the expiration of his FMLA leave. *Id.* ¶ 47. Schermitzler acknowledged that he could not return to his previous position as a PSO because he was not "fit for duty." He indicated a desire to continue working for the Village either on "light duty" or in another capacity that would accommodate his disability. Dkt. No. 46-8 at 110. No offer of light duty as a PSO or a different job with the Village was offered, however, and Schermitzler's employment with the Village was terminated on April 25, 2019. *Id.* at 124. Less than a year later, Schermitzler commenced this lawsuit.

In his amended complaint, Schermitzler asserts nine overlapping claims, not counting subparts, against the Village and/or Ms. Swanson. Counts 1 through 3 allege the denial of, interference with, and retaliation for Schermitzler's exercise of his rights under the FMLA. Counts 4 through 6 arise under the ADA. Count 4 alleges harassment and discrimination in the terms and conditions of employment on account of a disability, Count 5 alleges retaliation against Schermitzler's opposition to the defendants' alleged ADA violations, and Count 6 alleges a failure

to provide Schermitzler a reasonable accommodation for his disability. Count 7 asserts a claim under 42 U.S.C. § 1983 for the alleged violations of Schermitzler's rights under the FMLA and the ADA. Count 8 asserts a defamation and slander claim against Swanson for statements she made to Dr. Meves, and Count 9 alleges that the Village violated Wisconsin wage and hours statutes by refusing to allow him to use his accumulated sick pay and underpaying him for his unused vacation benefits. Although Schermitzler seeks summary judgment on only his FMLA interference and ADA claims, Defendants seek summary judgment on the entire case.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted) (emphasis in original). All inferences drawn from the facts "must be viewed in the light most favorable to the party opposing the motion." *Id.* But just because the nonmovant comes up with some alleged factual dispute between the parties, it will not necessarily defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248 (emphasis in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matushita Elec. Indus. Co.*, 375 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 263, 289 (1968)).

# ANALYSIS

## A. FMLA Claims

### 1. The FMLA

The FMLA provides that an eligible employee may take up to twelve weeks of leave during any twelve-month period if he is unable to perform the functions of his position because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined in part as "an illness, . . . impairment, or . . . mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B). An employer is prohibited from interfering with the exercise of or the attempt to exercise any right under the FMLA. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780 (7th Cir. 2013) (citing 29 U.S.C. § 2615(a)(1)). And it is unlawful for an employer to retaliate against an employee who exercises or attempts to exercise FMLA rights. *Id.* at 781 (citing 29 U.S.C. § 2615(a)(2)). An employer who violates § 2615 by interfering with, restraining, or denying an employee's exercise of FMLA rights is liable for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). *See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

"When an employee initially requests FMLA leave, the employer may take the employee at his word and grant the request, or 'may request certification by the employee's healthcare provider.'" *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 837 (7th Cir. 2014) (quoting *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 886 (7th Cir. 2005)). If certification is requested, the employee must provide it "in a timely manner." 29 U.S.C. § 2613(a); *see* 29 C.F.R. § 825.305(b). The health care provider's certification for an employee who claims a serious health condition that

renders him unable to perform the functions of his position "shall be sufficient" if it provides "the date on which the serious health condition commenced," "the probable duration of the condition," "the appropriate medical facts within the knowledge of the health care provider regarding the condition," and "a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b)(1)–(3), (4)(B).

An employee's request for FMLA leave does not operate as a general waiver of the employee's physician-patient privilege. "If an employee submits a complete and sufficient certification signed by the health care provider, the employer may not request additional information from the health care provider." 29 C.F.R. § 825.307. "A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." *Id.* § 825.305(c). Even if the certification is incomplete or insufficient, the employer may not contact the health care provider directly. Instead, the employer must advise the employee in writing what additional information is necessary to make the certification complete and sufficient, and then provide the employee an opportunity to cure any such deficiency. *Id.*

The employer may contact the health care provider, however, for purposes of clarification and authentication of the medical certification. 29 C.F.R. § 825.307(a). But authentication and clarification are narrowly defined by the FMLA regulations. Authentication, as used in the FMLA regulations, "means providing the health care provider with a copy of the certification and requesting verification that the information contained on the certification form was completed and/or authorized by the health care provider who signed the document; no additional medical information may be requested." *Id.* Clarification means "contacting the health care provider to

understand the handwriting on the medical certification or to understand the meaning of a response." *Id.* The regulation states explicitly that "[e]mployers may not ask health care providers for additional information beyond that required by the certification form." *Id.*

The FMLA also "circumscribes the employer's right to challenge a physician's certification that leave is FMLA-qualifying." *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313 (7th Cir. 1998) (citing 29 U.S.C. § 2613); *see also Hansen*, 763 F.3d at 837. The employer may require that the employee obtain a second opinion, at the employer's expense, regarding information provided in the certification. 29 U.S.C. § 2613(c). If the second opinion differs from the opinion in the certification provided by the employee, the employer may require that the employee obtain a third opinion, also at the employer's expense. *Id.* § 2613(d)(1). The Act provides: "The opinion of the third health care provider concerning the information certified under subsection (b) shall be considered to be final and shall be binding on the employer and the employee." *Id.* § 2613(d)(2).

Courts are divided over whether the procedure set out in § 2613 is the exclusive way for an employer to challenge an employee's certification. Although the Seventh Circuit has not decided the issue, *see Darst v. Interstate Brands Corp.*, 512 F.3d 903, 911 (7th Cir. 2008), the Fourth and Eighth Circuits, focusing on the use of the permissive "may" in § 2613(c)(1), have held that "the FMLA does not require 'an employer to obtain a second opinion or else waive any future opportunity to contest the validity of the certification.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 385 (4th Cir. 2001) (quoting *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860 (8th Cir. 2000)). It does not follow, however, from the mere fact that § 2613(c) says an employer who has reason to doubt the validity of the certification "may" require the employee to obtain a second opinion that the employer can decline to do so and still challenge the employee's right to FMLA

leave in the first place.  The use of the permissive "may" simply means that an employer who doubts the validity of the employee's certification also has the option of simply accepting it and granting the requested leave.  This reading is consistent with the use of the word "may" in § 2613(a), which states that "[a]n employer *may* require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee . . . ."  29 U.S.C. § 2613(a) (emphasis added).  As noted above, "may" as used here simply means that "the employer *may* take the employee at his word and grant the request, or *may* request certification by the employee's healthcare provider." *Hansen*, 763 F.3d at 837 (emphasis added).  Focusing on the permissive meaning of the word "may" is thus not helpful to the determination whether the procedure set out in § 2613(c) and (d) is the exclusive way of challenging an employee's certification.

In *Sims v. Alameda-Contra Costa Transit Dist.*, on the other hand, the United States District Court for the Northern District of California held that an employer who denied an employee's request for FMLA leave without utilizing the statutory procedure for seeking a second and third medical opinion could not challenge the validity of the initial certification in a subsequent suit. 2 F. Supp. 2d 1253, 1261–62 (N.D. Cal. 1998).  The *Sims* court found the language of the statute ambiguous: "Although the language clearly states that the employer 'may' obtain second and third medical opinions, it is not clear whether this is the exclusive way for an employer to contest the content of a medical certification, or whether it is merely an optional dispute resolution mechanism."  2 F. Supp. 2d at 1260.  As *Sims* explains, a more careful consideration of "[t]he structure and internal logic of the Act also suggests that the certification procedures of section 2613 are the exclusive means for an employer to challenge the medical facts underlying the employee's certification." *Id.* at 1261.

In adopting the FMLA, Congress found, *inter alia*, that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). Among the stated purposes of the Act is "to entitle employees to take reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), and to do so "in a manner that accommodates the legitimate interests of employers," *id.* § 2601(b)(3). If deemed exclusive, the procedure outlined in § 2613 serves both these interests:

> The procedures allowing the employer to obtain second and third medical opinions are intended to protect against employee abuse by enabling the employer to ensure that the employee really needs to take time off. Thus, if the employer has reason to doubt the validity of the initial certification, the employer "may" require the employee to obtain a second opinion. However, this policy is balanced against the policy of ensuring "swift and expeditious coverage" for employees who are entitled "to take reasonable leave for medical reasons." *Id.*; 29 U.S.C. § 2601(b)(2).

*Sims*, 2 F. Supp. at 1261. To read the statutory procedure as non-exclusive, on the other hand, would upset this balance:

> The policy of providing swift and expeditious coverage would be undermined if an employer could simply deny leave to an employee who has presented adequate certification of his need for and entitlement to medical leave. An employee in that situation would have no recourse other than to forego the leave to which he may be entitled under the Act (if he requests leave in advance), or to take leave, suffer the employer's discipline for the "unexcused" absence (which may include termination), sue his employer, and then wait for the court to decide. Time is of the essence when an employee requests medical leave. Such leave is no longer necessary or appropriate once the illness or injury passes.

*Id.*

For these reasons, the Court adopts the construction of the FMLA advanced in *Sims*. The statutory scheme of the FMLA evinces an intent to ensure employees of a swift and expeditious determination of whether they are entitled to leave when their own physician confirms that they are unable to work. To hold that the procedure outlined in § 2613 is not exclusive would transform the question of whether an employee was entitled to FMLA from a simple medical question,

presumptively decided by the employee's doctor, into a question for a court or jury to decide, assisted by paid expert witnesses, but only after a lengthy and expensive discovery process during which the employee's entire employment and medical history would be disclosed to attorneys for the employer. This is not what Congress had in mind in enacting the FMLA, and it is not what the FMLA requires. The FMLA makes the complete and sufficient certification by the employee's own physician final unless the employer pays two other independent physicians to examine the employee and they both disagree with the employee's treating physician.

Reasonable people can conclude that, read in this way, the FMLA places too much faith in the honesty and integrity of employees and too much weight on the opinion of the employee's own doctor. In the social security context, the Seventh Circuit has cautioned against "the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The same is true as to FMLA leave. Especially when the serious health condition alleged is a mental impairment, such as depression or PTSD, the diagnosis and assessment of which depends primarily, if not exclusively, on the employee's description of his subjective symptoms, a family doctor's certification based on one or two office visits may seem a questionable basis upon which to require an employer to award its employee twelve weeks of often paid leave. But the Court's job is to apply the law as it is written, not as some might believe it should have been written, and it is clear from the language of the FMLA that it is "designed to have medical determinations made by health care providers, rather than courts," *Sims*, 2 F. Supp. 2d at 1261–62, or juries. The Court now turns to the application of that law to the undisputed facts of the case.

**2. Violation of FMLA and Denial of Right to Sick Pay Benefits**

Based on the undisputed facts, it is clear that the Village failed to comply with the FMLA's regulatory and statutory requirements. The initial certification provided by Dr. Meves was sufficient within the meaning of § 2613. It was signed by Dr. Meves and set forth the date on which the serious health condition commenced, the probable duration of the condition, and a statement that the employee was unable to perform the functions of his position, as required by § 2613(b)(1), (2), and (4)(B). With respect to § 2613(b)(3), the requirement that the certification state "the appropriate medical facts within the knowledge of the health care provider regarding the condition," Dr. Meves wrote, "Not sleeping, sour mood at home, can't leave work at work, takes home with him." Dkt. No. 40-7 at 4.

Defendants contend that the undisputed evidence shows that Schermitzler's request for FMLA leave was properly denied because the certification issued by Dr. Meves failed to provide all the necessary information. They acknowledge that Dr. Meves certified that Schermitzler was unable to perform the duties of his job but note that he did so without seeing Schermitzler's job description. They contend that his statement concerning what job functions Schermitzler could perform "is incredibly vague and provides no information to the defendants about the plaintiff's condition or his abilities." Dkt. No. 44 at 3. They also note that Dr. Meves statement of the relevant medical facts "describes only an inability to keep work and home life separate . . . , something that many Americans struggle with." *Id*. In addition, Defendants contend that the information in Dr. Meves' certification did not match the information in Schermitzler's application for FMLA leave. Schermitzler's application for FMLA leave referenced a series of physical maladies, including hypertension, diabetes, skin cancer, and that his body was "worn," which he suggested had accumulated "after 26 years of dealing with other peoples [sic] tragedies and being

on the edge of chaos . . . ." *Id.* at 4; Dkt. No. 40 at 3.  For all of these reasons, Defendants contend the certification submitted by Dr. Meves was insufficient and the Village's decision to deny Schermitzler's request was proper.

Swanson's concern over the legitimacy of Schermitzler's FMLA application was not unreasonable, especially considering her view that he was "very upset" when she told him shortly before he applied for FMLA that he was ineligible for early retirement, DPFOF ¶ 17, and the vague and inconsistent paperwork he submitted.  But the undisputed evidence establishes that the certification Schermitzler submitted met the bare requirements of § 2613(b), and Swanson did not seek to clarify or challenge his certification in the proper way.  The certification provided by Dr. Meves unequivocally states that Schermitzler was unable to perform any of his job functions.  There is no requirement that the physician review an employee's job description before making such a determination.  In fact, the Village's own form states, "If job description isn't attached, answer based on employee's own description of his/her essential job functions."  Dkt. No. 40-7 at 4.  Moreover, if Swanson believed that Dr. Meves' certification was incomplete or insufficient, she was required to advise Schermitzler in writing what additional information was necessary to make the certification complete and sufficient, and then provide him an opportunity to cure any such deficiency.  29 C.F.R. § 825.305(c).  Swanson did not do so, however, and instead contacted Dr. Meves directly with a list of questions seeking information she felt was necessary in order for her to assess Schermitzler's claim that he was entitled to FMLA leave.  Swanson later testified she was unaware of the procedure mandated by the FMLA.  Dkt. No. 24-1 at 17–18.

That the Village Manager was unaware of the requirement makes no difference.  The failure to provide Schermitzler an opportunity to cure what it thought was an incomplete or insufficient certification constitutes a violation of the FMLA.  Having failed to allow Schermitzler

to cure, the Village could not deny him FMLA leave based on the perceived insufficiency of his certification. *Hansen*, 763 F.3d at 842 (citing *Sims*, 2 F. Supp. 2d at 1266).

Swanson seems to have been likewise unaware of the FMLA's exclusive means for challenging the certification provided by an employee's doctor when she initially denied Schermitzler's application for FMLA leave. Instead of requesting a second opinion from another doctor as the FMLA requires, 29 U.S.C. § 2613(c), she decided on her own that Dr. Meves' certification was insufficient and that Schermitzler was not entitled to leave. When she later did request a second opinion, after Schermitzler submitted a second application, Dr. Childs confirmed Dr. Meves' and Nurse Practitioner Mangan's opinion that Schermitzler was unfit for duty. Dkt. No. 40-7 at 42. While by that time the Village had already approved Schermitzler's second application for FMLA leave, that application only covered the period beginning November 15, 2018. Schermitzler's initial application and certification sought leave as of October 1, 2018, and the Village's settlement with the Department of Labor only covered the period beginning November 3, 2018. Because the first certification was sufficient and the Village never sought a second opinion under § 2613(c), the Village's denial of Schermitzler's initial request violated the FMLA.

Defendants argue that, even if Schermitzler can show a "technical violation" of the FMLA for the Village's initial denial of his request for leave, his claim nevertheless fails because he is unable to show that he was prejudiced or sustained any harm or damages as a result of the violation. Dkt. No. 44 at 6. Quoting *Ragsdale*, they note that, in order to prevail on a claim under the FMLA, an employee must prove that he was prejudiced by the violation: "§ 2617 provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses

sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)."  535 U.S. at 89. The only loss Schermitzler seeks for the initial denial of his FMLA request is the value of his vacation and comp time benefits he was required to use for the period from October 12 through November 2, 2018, when he was denied the use of his accumulated sick leave benefits.  Defendants contend that, because he was able to use his vacation and comp time benefits during this time, Schermitzler suffered no loss and his FMLA claim for the initial denial of his request should be dismissed.

Schermitzler points out, however, that had he not been forced to use his vacation and comp time benefits during the period, he would have received the cash value of those benefits upon the termination of his employment.  The same is not the case for unused sick leave benefits. Employees are not paid for unused sick leave benefits.  DPFOF ¶ 17.  Since Defendants concede that the only reason he was not allowed to use his sick leave benefits was because his request for FMLA leave was denied, Schermitzler is entitled to recover at least the value of the vacation and comp time benefits he was required to use instead.  Schermitzler's motion for summary judgement on this claim is therefore granted.

### 3. Discrimination/Retaliation in Violation of FMLA

Schermitzler also claims retaliation for his assertion of his FMLA rights.  He claims that Defendants refused to allow him to work as a PSO on light duty or consider him for alternative positions that were available in retaliation for his assertion of rights under the FMLA.  Defendants seek summary judgment on this claim.

An employer "cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions."  *Pagel v. TIN, Inc.*, 695 F.3d 622, 631

(7th Cir. 2012). A plaintiff can prove discriminatory intent either directly or indirectly. *Id.* Schermitzler offers evidence under the direct method from which a jury could find in his favor. Under the direct method of proof, the employee "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Proof of discrimination under this method can include "near-admissions by the employer that its decisions were based on a proscribed criterion," or circumstantial evidence that suggests discrimination "through a longer chain of inferences." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). A plaintiff claiming a materially adverse action prohibited by FMLA may overcome a summary judgment motion if he creates "'a triable issue of whether the adverse employment action of which [he] complains had a discriminatory motivation.'" *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 995–96 (7th Cir. 2010) (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008)). In other words, in order to survive summary judgment, Schermitzler must be able to rebut Defendants' evidence that they would have taken the adverse action with or without a discriminatory motive. *Id.* at 995.

There is no dispute that Schermitzler engaged in statutorily protected activity. He requested leave beginning October 1, 2018, was initially denied, and was later approved for leave from November 15, 2018, through March 24, 2019. The first element is thus clearly met. There is also no dispute that he was subject to an adverse action—instead of being offered an accommodation or a different position, he was fired on April 25, 2019. With regard to the third element, Defendants argue that Schermitzler's termination was not due to his requests for leave but rather his admitted inability to do his job. Schermitzler does not dispute that he was unable to perform the duties of a PSO at the time he was discharged in April 2019. He contends, however,

that he was capable of light duty until such time as he regained the ability to do his job, or he could have performed other jobs that the Village had available and for which he requested the Village consider him. The record demonstrates that, in previous cases in which a PSO was unable to perform all the duties of his office, the Village provided light duty work. PPMF ¶¶ 83–84. Schermitzler has also offered evidence that the Village had other jobs available that he could perform but that the Village refused to consider his request that he be considered for them. *Id.* ¶¶ 86–87. Schermitzler argues that either light duty or a transfer to another open position would have been a reasonable alternative to termination. He contends that, absent Defendants' hostility toward his FMLA claim reflected in Swanson's direct handling of his case and in her refusal to allow him the use of his sick leave benefits, the Village would have provided him such an accommodation. Defendants' refusal to do so, he argues, violated the prohibition of discrimination and retaliation against employees for the exercise of rights under the FMLA.

Schermitzler has provided more than sufficient evidence for a jury to find in his favor on this claim. Defendants' motion for summary judgment on the claim of retaliation is therefore denied.

**B. ADA Claims**

Both Schermitzler and Defendants seek summary judgment on Schermitzler's claims under the ADA. The ADA prohibits discrimination in the conditions and terms of employment against a qualified individual with a disability on account of such disability. 42 U.S.C. § 12112(a). The ADA also imposes on covered employers a duty to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. *Id.* § 12112(b)(5)(A). Defendants do not dispute Schermitzler's claim that he has a disability within the meaning of the ADA. *But see Robinson v. Colvin*, No. 13 C 2006, 2016 WL 1161272, at *4

n.7 (N.D. Ill. Mar. 24, 2016) (collecting cases holding PTSD not a disability within the meaning of ADA).

In any event, Schermitzler contends he is a qualified individual with a disability and that Defendants violated his rights under the ADA by subjecting him to harassment and discrimination in the terms and conditions of his employment on account of his disability, retaliating against him because of his opposition to their violations of the ADA, and by refusing to provide him a reasonable accommodation. Schermitzler contends that the undisputed evidence establishes that he has a disability and that Defendants violated the ADA by terminating his employment instead of reasonably accommodating his disability by placing him on light duty and/or by transferring him to one of the open and available jobs with the Village. Dkt. No. 21 at 21–26. Defendants, on the other hand, argue they are entitled to summary judgment because, by his own admission, Schermitzler was unable to perform the functions of a PSO and the Village had no light duty or other positions for which he was qualified available. Dkt. No. 26 at 19–21.

There is no dispute that Schermitzler was unable to perform the functions of a PSO at the time his employment was terminated. It is not clear, however, how long his inability to perform those functions would last. His counselor reported improvement with time, and although Dr. Childs found him unfit for duty at the time he issued his report in January 25, 2019, he thought he would be able to return to work sometime thereafter. Dkt. No. 40-7 at 48. As noted above, Schermitzler has offered evidence that the Village had a policy, albeit unwritten, of offering light duty of a type he could perform for as much as a year. PMFF ¶ 47. He also offered evidence that the Village had seven other jobs open and available for which he was qualified. *Id.* at ¶ 51.

This evidence is enough to defeat Defendants' motion for summary judgment. While it is true that an employer need not create a light duty position for a non-occupationally injured

employee with a disability as a reasonable accommodation, "if an employer has a policy of creating light-duty positions for employees who are occupationally injured, then that same benefit ordinarily must be extended to an employee with a disability who is not occupationally injured unless the company can show undue hardship." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017); *see also Williams v. Bd. of Educ.*, 982 F.3d 495, 506 (7th Cir. 2020). And it is also true that "reassignment to a vacant position may be a reasonable accommodation under the statute." *Severson*, 872 F.3d at 482 (citing § 12111(9)(B)). Defendants' motion for summary judgment on Schermitzler's ADA claim must therefore be denied.

As for Schermitzler's motion for summary judgment, Defendants deny any policy of providing light duty for indefinite periods of time to accommodate employees with disabling conditions. Defendants also contend that Schermitzler never made clear what functions he could perform, despite his disability, and they dispute whether he was qualified for at least some of the jobs he claims were vacant. The record is not sufficiently clear as to what Schermitzler was capable of doing or what functions the vacant jobs entailed to allow entry of summary judgment on this claim in Schermitzler's favor. Accordingly, his motion for summary judgment on the ADA claim is likewise denied.

## C. Section 1983 Claim

To prevail on a § 1983 claim, the plaintiff must prove that "(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). In this case, Schermitzler claims that Swanson, acting under color of state law, violated his rights under the FMLA and the ADA, both "laws of the United States," and that the Village, by condoning her actions, is liable under that statute as

well. In other words, Schermitzler seeks recovery under § 1983 for the same violations of the FMLA and ADA that make up his claims under those very statutes.

Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005). The Supreme Court has recognized that "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Levin v. Madigan*, 692 F.3d 607, 611 (7th Cir. 2012) (quoting *Abrams*, 544 U.S. at 120); *see also Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 427 (1987) (provision of private judicial remedies in statute evidences congressional intent to supplant the § 1983 remedy). Both the FMLA and the ADA provide express, private means of redress themselves and thereby suggest that Congress did not intend to leave open a more expansive remedy under § 1983. Although Schermitzler has belatedly attempted to add as a claim under § 1983 an alleged violation of his rights under the Equal Protection Clause of the Fourteenth Amendment, no such claim appears in his amended complaint. For these reasons, Schermitzler's § 1983 claim fails and Defendants' motion for summary judgment as to that claim will be granted.

## D. State Law Claims

### 1. Defamation and Slander

Schermitzler alleges that, on October 22, 2018, when discussing his case with Dr. Meves, Swanson made false and defamatory statements about him in violation of state common law. A common law defamation action involving a private individual includes three elements:

"(1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her."

*In re Storms v. Action Wisconsin, Inc.*, 2008 WI 56, ¶ 37, 309 Wis. 2d 704, 750 N.W.2d 739 (quoting *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997)). To determine whether a statement may have a defamatory meaning, the words "must be considered in context in relation to the whole." *Westby v. Madison Newspapers, Inc.*, 81 Wis. 2d 1, 6, 259 N.W.2d 691 (1977). If the challenged statements are substantially true, the defamation action fails. *Torgerson*, 210 Wis. 2d at 535.

Here, Schermitzler's claim is based on Dr. Meves' unsworn notes purportedly of a conversation he had with Swanson. Swanson allegedly communicated to Dr. Meves that she "felt" Schermitzler "was not being totally honest" with him and that there "might be some background investigations going on concerning [Schermitzler]." Dkt. No. 43-1 at 2. A year later, Dr. Meves supplemented his report by noting that Swanson also "did make mention of Scott's former use of alcohol that I took to mean a previous accident that did occur many years previously." *Id.* at 1. Dr. Meves also noted that it did not appear from his medical record that Schermitzler had any recent problems with alcohol, *id.*, and his view of Schermitzler and willingness to treat him apparently was not altered by the conversation.

As a threshold matter, the notes are not admissible as evidence and therefore cannot be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(B). Even if the notes were admissible, however, the alleged statements are not sufficient to support a claim for defamation against Swanson. Swanson's statement that she "felt" Schermitzler was not being honest with Dr. Meves is clearly not actionable. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Although they were discussing Schermitzler's diagnosis, it is

plain that Swanson was offering her subjective view that Schermitzler was not being totally honest with Dr. Meves. Swanson made no claims to knowing the contents of their private discussions or of Schermitzler's actual medical needs. Schermitzler does not contest that he was cited for operating a motor vehicle while intoxicated (OWI) in the past, or that he was involved in an internal investigation, so her statements on those matters were substantially true. Schermitzler also complains about an alleged *implication* that he had recent problems with alcohol. But that implication is not referenced in Dr. Meves' contemporaneous notes or in Swanson's sworn testimony, and Schermitzler can point to no facts showing that she made such a statement. He bases his argument entirely on a note written more than a year after the conversation which stated, "It did *appear* that she *felt* Scott *may* have had recent problems with alcohol use." *Id.* (emphasis added). Even drawing all reasonable inferences in favor of Schermitzler, his doctor's belated, unsworn recollection of the statements Swanson purportedly made do not support a claim for defamation and slander. Defendants' motion for summary judgment on this claim will therefore be granted.

### 2. Wisconsin Wage Payment and Collections Statutes

The final claim advanced by Schermitzler is that the Village violated Wis. Stat. § 109.01(3) by denying him the ability to use his earned sick leave benefits from October 12, 2018, through November 2, 2018, and by under-paying out his earned vacation benefits at a lesser hourly rate rather than the customary overtime rate used for other employees who retired or otherwise separated from employment. Because the Court has already concluded that Schermitzler is entitled to summary judgment on his FMLA claim concerning the use of his sick leave benefits, the only question now before the Court is at what rate his vacation benefits should have been paid.

"A Wis. Stat. ch. 109 wage claim is meant to be a procedure for employees to get prompt payment of monies clearly owed to them by their employers." *Sliwinski v. City of Milwaukee*, 2009 WI App 162, ¶ 17, 321 Wis. 2d 774, 777 N.W.2d 88. This includes renumeration of earned wages while the employee is "sick, on vacation, laid off or after dismissal." *Id.* ¶ 18. "[T]here are two facets to the Wis. Stat. § 109.01(3) wage claim: (1) the employee must have at some time performed personal services that entitle him or her to the wages; and (2) the employee's entitlement to the wages must be clear and already determined by either an agreement or employer's policy." *Id.* ¶ 17. The first facet of Schermitzler's claim is clearly satisfied. He was employed by the Village for 26 years and accrued sick, vacation, and compensatory benefits during that period. The question before the Court is whether the Village properly paid Schermitzler for those earned benefits.

The Village contends that Schermitzler is entitled to a payout for his accrued benefits at an hourly rate determined by the actual number of hours he worked per year. This amount differs, the Village contends, based on whether the PSO is what it calls a Line employee or a Day employee. A Line employee is a PSO who works 24-hour shifts, one day on and two days off, for a total of 2,920 hours a year. Dkt. No. 46-10 at 2. A Day employee ordinarily works eight-hour days, five days a week, for a total of 2,080 hours a year. The rate of pay is obviously larger if the employee's annual salary is divided by 2,080 hours than it would be if the salary is divided by 2,920 hours. *Id.* at 6–7. The Village contends that, because Schermitzler was a Line employee, his rate is his salary divided by 2,920.

Schermitzler, on the other hand, contends that the uninterrupted past practice has been for the Village to determine the value of PSOs' accrued benefits by using an hourly rate determined by dividing their annual salary by 2,080 hours, no matter whether they were Line employees or

Day employees. This past practice, he contends, if not the actual terms of his employment contract, govern the rate of pay he should receive for his accrued benefits. *See* Dkt. No. 41 at 28. The issue was recently decided by an arbitrator ruling on a grievance that arose under the collective bargaining agreement (CBA) between the Village and the union. Dkt. No. 46-10. The arbitrator ruled in favor of the union, but because Schermitzler is not a member of the union, he is not a party to the CBA and the arbitrator's decision is not binding on the Court. The issue is also before a Brown County Circuit Court as it affects two recent retirees.

Given this history and the absence of any clear contractual language (at least none that has been brought to the Court's attention) controlling the issue, the Village is not entitled to summary judgment on this claim. Although the issue may well be one of law, the arguments of the parties are not sufficiently developed to allow entry of summary judgment in favor of either party. In order to prevail under ch. 109, an "employee's entitlement to the wages must be clear and already determined by either an agreement or employer's policy." *Sliwinski*, 2009 WI App 162, ¶ 17. Schermitzler's entitlement to pay at the rate he seeks is not clear and readily determined on the record before the Court. Yet, the evidence and argument he has offered preclude a summary judgment in favor of the Village based on the record as it now stands. As such, summary judgment on this issue must be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Schermitzler's motion for partial summary judgment (Dkt. No. 20) is hereby **GRANTED** as to his FMLA claim for the denial of sick pay benefits for the period between October 12 through November 2, 2018. In all other respects, his motion is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED-IN-PART** and **DENIED-IN-PART**.   Summary judgment in favor of Defendants is **GRANTED** as to Plaintiff's Section 1983 claim (Count 7) and common law defamation claim (Count 8), and those claims are dismissed with prejudice.   In all other respects, Defendants' motion is **DENIED**.

Dated at Green Bay, Wisconsin this 12th day of July, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
